Good morning, everyone. We have five cases before the panel this morning. Three of them are argued and two of them are being submitted on the briefs without oral argument. I will just indicate for the record the two submitted cases. The first one is number 05-3329, Weich v. Department of Labor. The second one is number 06-3087, Lua v. United States Postal Service. Again, those two cases are being submitted on the briefs. The first case in which we will hear oral argument this morning is number 05-1414, Kim v. Conagra Foods Inc. Mr. Pelletier, you have reserved three minutes for rebuttal. You can step up and begin whenever you are ready. Good morning. May it please the Court. Dr. Kim is here today to reinstate the jury verdict as to Claim 10 regarding infringement and to reverse the jury's non-infringement verdict with respect to Claim 5 and the jury's verdict of non-willfulness. There are five issues that I would like to touch upon today. Claim construction, infringement, validity, the propriety of the district court admitting Dr. Kim's testimony, and willfulness. On the issue What is wrong with the district court's claim construction? If you look at the specification of this patent, there is a lot of emphasis that the present invention has the effects of a replacer composition. And the district court said that he's going to read the preamble as requiring that it have those effects. What's wrong with that construction? What's wrong with that construction, Your Honor, is that the district court is not adhering to the plain and ordinary meaning of the term potassium bromate replacer. Properly construed, and as the specification further supports, the term potassium bromate replacer, or PBR, simply means potassium bromate substitute. So when you have a PBR . . . Well, what's the . . . I mean, we're supposed to look at the specification under cases like Lebo and Simed. We look to the specification, particularly when it says the present invention is X. And you look at this specification, there's a lot of discussion about the present invention being different from the prior because it has these effects that the district court held were claim limitations. So, I mean, aside from the ordinary meaning of replacer, what's your basis for contending that he made a mistake? Throughout the specification, and we cite these portions in our brief, the court refers to the fact that the potassium bromate replacer composition is a substitute for potassium bromate. There is no effect language in the specification that could properly be read into the claims, and I . . . I am not aware of any language in the specification, Your Honor, that states that it is proper to read into the claim limitations or that there's a specific claim limitation that calls for an effect. I think that there's much in the specification that describes the science behind the invention and the results . . . Well, take a look at Column 1 of the specification, which is at 233, and do you have that? It's on line 57 of Column 1. We're at line 57 of Column 1. It says, The President's invention is particularly useful that it provides natural ascorbic acid as the only oxidizing agent in dough that is effective and functional throughout the entire manufacturing process. So there are suggestions here in the specification that the President's invention has to be effective, right? I agree with you completely, Your Honor, that the invention works, and the evidence established that. But for the district courts, you have stated that Dr. Kim must prove some effect with respect to dough strengthening, some effect with respect to . . . The President's invention has advantages of using ascorbic acid as the only oxidizing agent and providing adequate strengthening of dough throughout the manufacturing process. And I agree with what you're reading, certainly, Your Honor, but I think that the district court is improperly taking limitations from the specification and importing them into the claims. The district court never stated which limitation it was referring to when it was reading these limitations into the claims. It accepted Conagra's argument. I'll also emphasize that regardless of the claim construction that's adopted, the evidence supports the jury's finding of infringement of Claim 10, and the evidence also supports a finding of infringement with respect to Claim 5. Well, how can that be when there is no testimony from Dr. Kim or from anyone else as to the accused compositions? My understanding is that the entire infringement theory rested on an inference that because her experiments with respect to the patented material showed these effects, that she would assume that those effects were present in the accused compositions. Your Honor, in Conagra's brief, they admit that they add ascorbic acid as a dough strengthener in the evidence. No, no, but wait, wait, wait, wait, wait, wait. What's the answer to my question? The evidence? Is it not correct that that is the basis for his – her infringement testimony? She did not examine the accused compositions, right? She did not do any tests with the exact formulas. That is correct. But Dr. Hosny did. And Dr. Hosny, Conagra's expert, testified that ascorbic acid – the science – ascorbic acid converts to dehydroascorbic acid in the presence of metal ions. He testified that dehydroascorbic acid acts – is an oxidant that strengthens dough and it increases loaf volume. Dr. Hosny, Conagra's expert, testified that tartaric acid, one of the claimed food acids, assists with the oxidation. Dr. Hosny's tests of the 7-grain and whole grain were tests of the accused formulas, and he concluded that there was no statistically significant difference between breads made with Dr. Kim's potassium bromate replacer compositions and breads made with potassium bromate. And the interesting thing about his tests is that he used twice the legal limit of potassium bromate when he ran his tests. He used 150 parts per million potassium bromate to come up with some – Did he testify that the accused compositions infringed the patent? Did he? Yeah. I think without – he was an expert, and I don't think he was going to get up there and admit that ultimate conclusion, but the jury heard the evidence from Conagra, heard the evidence from Dr. Kim, and concluded, properly so, that every limitation was present in the claims under the proper claim construction, where PBR simply means PBR substitute, or  Wait, wait, wait. Under the other – Wait. Don't talk over me. Did he testify that the accused compositions satisfied the limitation in the claims? The ultimate conclusion? No. Okay. But his testimony more than amply – more than supports it. As I understand it, Mr. Boutier, what the district court said was, I mean, there was a stipulation here to the effect, I think, that the accused product contained the components of the claim, but non-infringement was found based upon the construction that you had to have these specific effects. Is that correct? That is correct. Okay. Well, let me ask you – let me ask you this. I mean, what is your – if you could just repeat again, what is your claim construction of the term potassium bromate replacer? What do you say it should be? It simply means potassium bromate substitute. In other words, if you read – if you look at the claim language, and you read the specification, and you take the term replacer in its ordinary meaning, or give it its ordinary meaning, it simply means where the PBR, potassium bromate replacer, is present. Potassium bromate is not. And that is one of the key components to Dr. Kim's invention. What about the oxidant factor in the claim? I mean, because it does seem that the potassium bromate replacer is to be a – I guess it's a slow-acting oxidant, which will be effective through the proofing, the forming, the proofing, and then the baking process. Is that correct? Yes. And the limitation as an oxidant is stating, or is stated in the claims, means that that ascorbic acid has to be transformed, has to transform into its dehydroascorbic acid oxidizing form. Let me ask you – I'm sorry. No, no, that's – I understand. You were in the middle of your sentence there. But you say a – the correct claim construction is a potassium bromate replacer, right? Substitute. Substitute. I'm sorry, substitute. Don't we need a little bit more than that? I mean, Judge Dyke has articulated places in the spec where one could reasonably say, well, it has to have certain results. Certainly, though, don't you have to have more than just saying it's a substitute? Is that – I mean, doesn't it have to be some – I guess what I'm saying, doesn't there have to be some definition to substitute? Because the spec does say – I don't know if it came up – well, maybe it did in your discussion with Judge Dyke, but it says it has to be an effective – I think, I guess in column 2, line 39, it is an object of the present invention to provide an effective potassium bromate replacer. Doesn't that – don't we need, in other words, a little bit more definition beyond just a substitute? Do you understand what I'm saying? Yes, I do. And I – based upon the intrinsic evidence, Judge, the answer to your question is no, because a person of ordinary skill reading this specification and reading the claims and, indeed, reading the prosecution history, would recognize and know what potassium bromate is. These statements in this specification – You want to have a slow-acting oxidant. Is that the idea here? It is, yes. It is. And some of the dependent claims go to this slow-acting effect and talk about certain functional attributes of the invention. But the independent claims do not. And that's another flaw with the district court's claim construction, that if you take claim differentiation, which is merely a guide – I recognize that – but if you use that guide to analyze the claims in the context of the specification, it's appropriate to give PBR its plain and ordinary meaning. And a person of ordinary skill in the art would appreciate that – or those results that potassium bromate would give to you and realize that if you need not add potassium bromate here and you take Dr. Kim's invention and put it into the bread, as Dr. Hosny did, you will get good results. Nobody's contesting that. Nobody's contesting the utility of the patent. But I think that's what those statements in the specification go to more than the need to read limitations into the claims. It is a straightforward claim interpretation. I'll give you that, but I think it's proper. And I do emphasize again that district court's claim construction, albeit incorrect, was satisfied, or the burden of proof on the issue of infringement was satisfied and the jury properly found as much. Well, T, you have about three minutes and twenty-five seconds left, so you're just about into your rebuttal time. Do you want to wait and preserve the rest of your rebuttal? I will. Thank you. Mr. Schroeder? May it please the Court, I am Robert A. Schroeder from the law firm of Bingham & McCutcheon and I represent ConAgra. I'd like to begin by addressing this question of the meaning of the claim and what it calls for that several of the judges have raised this morning. Certainly, it's not disputed here that the preamble of the claim, a potassium bromate replacer composition is a limitation here. And to me it doesn't make sense to say that the fact that one ingredient is present and potassium bromate is not present, therefore that ingredient must be a potassium bromate replacer. That just doesn't make sense because there are many, many different reasons for putting ingredients in bread mix that have nothing to do with replacing potassium bromate. And it can't be a matter of subjective intent. The ConAgra employee who developed the formula here, Mike Waltz, testified that, for example, the raisin juice that was present which contains the tartaric acid that forms part of the basis for Dr. Kim's claim was added as a mold inhibitor, a colorant, and a flavorant. And Dr. Kim does not dispute that raisin juice has been added for those reasons. Mr. Schroeder, let me ask you this question. I think Mr. Pelletier's position, as I understand it, is that the error in the district court's claim construction, he was articulating his view with both me and Judge Dyke, is that the district court judge read limitations into the claims impermissibly from the specification. I mean, I think that's what his argument is with respect to the district court's claim construction, as I understand it. And isn't that a pretty well-settled proposition that limitations from the specification should not be, that you shouldn't read into the claims limitations from the specification? Well, certainly, Your Honor, it's not proper to take a limitation that is not present in the claim and add it from the specification. That's a better way of saying it than what I said. But it is proper to look to the specification and the prosecution history to determine the meaning of limitations which are found in the claim. Now, certainly, the specification does suggest that it's an objective of the invention, and one of the purported advantages of the invention is that you'll obtain grain and texture and various other things that the district court put in as part of the claim construction. But is it the spec saying that those are advantages and results, rather than saying that they should be limitations of the claim? Well, I think, Your Honor, my answer would be no, that the specification as I read it would require that this be present, because that is the meaning of the phrase, a potassium bromate replacer. If it doesn't do certain things, primarily increase the volume of the bread, then it is not a potassium bromate replacer. Well, what if you say a potassium bromate replacer is an item that acts as a slow-acting oxidant? Well, I don't know of any basis for defining it that way. Dr. Kim has a theory which is unsubstantiated, not proven by any tests and not agreed to by other people in the field, that it's two parts. One is that the addition of her food acid causes the oxidation reaction to be prolonged over the course of the baking process, of the bread-making process. And the second is that prolonging that is beneficial. It's with respect to the second part of that that we have the greatest problem. Dr. Hosny said that he didn't believe that that was true, because this is an oxidation reaction and it requires the presence of oxygen. As bread is baked, yeast scavenges the oxygen. If you save the... When you say it scavenges the oxygen... It consumes the oxygen. It binds it up to the soil. I'm not sure that I'm understanding your basis for saying that the construction proposed by Judge Schall is without support, because it certainly is supported by the specification in the sense that this is supposed to function as a slow-acting oxidant. The question is whether these additional requirements should also be viewed as claim limitations. Well, I don't believe, Your Honor, that the specification can be read as suggesting that the definition of a potassium bromate replacer requires that the oxidant be slow-acting. That is the theory of Dr. Kim as to what... I don't understand what you're saying, because it seems to me that the specification talks explicitly about that. It certainly... The specification most certainly says that, according to Dr. Kim's theory, this is a particularly advantageous bromate replacer because of the prolonged oxidation effect. But I don't think the specification can be read as saying that is the definition of a potassium bromate replacer, that something, according to Dr. Kim, ascorbic acid alone isn't as good because it's faster. But I don't think she's saying ascorbic acid is not a potassium bromate replacer. If you look at column 2, line 60, the advantage of potassium bromate replacer provided in the present invention are, B, it is a slow-acting oxidant. So the specification does seem to say that its function as a slow-acting oxidant is part of the invention. Well, if I may call Your Honor's attention to column 2, line 29, starting with, however these potassium bromate replacers have disadvantages because they have a fast-acting or intermediate reaction rate. So that is an acknowledgment, it seems to me, that there are potassium bromate replacers which do not have the advantage that she supposedly attributes to the present invention, that potassium bromate replacers is a broader category of things that includes fast-acting oxygens. What if you said, excuse me, Mr. Trowell, what if you said a potassium bromate replacer is a replacer that acts as an oxidant? The mere fact that something acts as an oxidant doesn't necessarily mean it's going to function as a potassium bromate replacer. And in fact, the DeStefano's patent, or publication, I think captures this thought very nicely on page 2 at the bottom. It says, chemistry within certainty why the present composition is so effective. And I think that remains a true statement today. That's what Dr. Hosny said. This is a very complex chemical system. People have various theories as to why different substances have the effects they do, but no one really knows. Dr. Kim has a theory, which is contrary to that offered by DeStefano's and Dr. Hosny, that a prolonged oxidation effect is beneficial, but I think we need to remember that Dr. Kim's own tests did not support her theory. In fact, there has never been a test, there is no test anywhere in the record of this case, which suggests that adding tartaric acid to the mix, which is what Conagra did, has any beneficial effect in terms of dose strengthening. Let me ask you, Mr. Schroeder, this is kind of by way of a housekeeping question, if you will. At page 1014 of the Joint Appendix, we have these various stipulations. Now, obviously, we can go one of two ways on the claim construction. We can affirm the district court's claim construction as you're urging, or agree with it, or we could, as Mr. Pelletier is arguing, we could reject the claim construction. Obviously, if we affirm the claim construction, you prevail on the infringement issue, and so forth. Now, what if we adopt, however, the other alternative, we're speaking hypothetically, not to suggest how the panel is going to rule one way or the other. If we adopt a different claim construction, in other words, if we say the district court erred in the claim construction, where does that leave the case in terms of the stipulations that we have? In other words, you automatically win if we accept the district court's claim construction. If we don't accept it and adopt a different one, does that mean you lose, given the stipulations? I don't think there's any stipulation that controls that, Your Honor. Well, what I'm suggesting is, I mean, you do have here, and correct me if I'm wrong, is I read the stipulation at 1014 of the joint appendix. You agree, and please correct me if I'm wrong, that the product, the ConAgra product, has the ingredients of the claim. That's correct. So it would seem to me then, and please correct me if I'm wrong, that if we disagree with the judge's claim construction, I mean, you won because your product didn't meet the additional limitations that the judge said were necessary in a potassium bromate replacer. But what if we said those limitations were wrong? Where does that leave you in view of the stipulation? Do you understand what I'm saying? Yes, I do. And if the court were to hold that any bread mix that contains these acid compositions, this acid combination in the required proportions infringes, if that's the interpretation of the claim, then yes, we would infringe. What if we said, what if one were to say, well, the correct interpretation of a potassium bromate replacer is a slow-acting oxidant that is functional throughout the entire manufacturing process, or if we just said it's a slow-acting oxidant, where would that leave you in terms of the infringement issue? It would leave us exactly where we are, that there is no proof that these acids act as a slow-acting oxidant in the particular bread formulas and processes. So you would say if a different claim construction was arrived at by the court, then it would not be a reversal in terms of a judgment for Kim, but rather it would have to go back for factual determination. Well, if the court went so far, if the court were to say that all that Dr. Kim needed to prove was the presence of these acids in the required concentrations, then she would win. But if she has to prove anything more than that, if she has to prove that it's a slow-acting oxidant, if she has to prove something else, then she does not win, and I don't think it's necessary to send the case back to the district court, because I think this court can determine that she never put any evidence in the record to show that there was any such effect, whether you define it in terms of a slow-acting oxidant, or whether you define it in terms of increasing the volume of the bread, the proof is not there. There is no proof that adding the raisin juice of the tartaric acid, or that adding the combination of tartaric acid and ascorbic acid had any beneficial effect here at all. The only tests that were done on the ConAgra product and process were those of Dr. Hosny, and Dr. Hosny found that when he added the tartaric acid, which brought in Dr. Kim's formula, the volume of the bread decreased. Well, now, but you're talking about volume of bread again. I think what Judge Schall is asking you is, was there evidence that it functioned as a slow-acting oxidant? Well, the inference there would have to be that it didn't, because it didn't do it. Well, now, that's an inference. That's correct. I don't know whether you have any more infringement, but I wanted to ask you a couple of questions about the invalidity issues. First of all, if hypothetically we were to agree that there's no infringement here, just hypothetically, do we have to go on and reach these invalidity issues, including the recapture? I would strongly urge the Court to do that, because there are three other cases pending involving this very same patent. It seems to me that, and we do have a declaratory judgment counterclaim here for invalidity of the patent. That answers my question. Yes. I must say, looking at the reply brief, 22, on the significance of this De Stefanis reference, I think that the statement in the reply brief, the page 22, your sir reply brief, is misleading, because it uses ellipses to suggest that this part of the instruction that mentions this Stefanis reference was part of the anticipation instruction. And as I read the record, it is not part of the anticipation instruction. It is very clearly only part of the obviousness instruction. You may not be familiar with it, but I express concern about that, and I'm going to give you the opportunity to address it if you can. Well, I would certainly think, Your Honor, that if De Stefanis anticipates the invention, it also makes the invention obvious. No, no, that's the other way around. It wasn't raised with respect to anticipation. Your reply brief suggests that it was. The brief, it strikes me, is a misleading use of ellipses to suggest that this part of the instruction referring to De Stefanis was part of the anticipation instruction. It seems to me quite clear, looking at page 01, 67, and 68, that it is explicitly only part of the obviousness instruction. Well, I think the answer to that, Your Honor, I must admit I don't have that great recall of the instructions, but if the instruction was obviousness, and if the reference anticipates, then obviously the reference renders the claim. No, no. The question is, you argue that the judge instructed the jury about the De Stefanis reference in connection with the anticipation instruction. I'm suggesting to you that that is inaccurate, and that the instruction is very clear that it only includes the De Stefanis reference in obviousness, not anticipation. You can look at it. It's all 167. I recall that, Your Honor. It seems to me that what we were doing there was referring to the second instruction as a definition of the prior art. I don't think we have different definitions of prior art for obviousness and anticipation. That's correct, and there's a listing of the prior art under anticipation which does not include De Stefanis. I just want to give you the opportunity to address that, because I'm concerned about the representation that's made here, the use of the ellipses to suggest that two things were together which weren't together. Well, they're certainly not contiguous in the instruction, Your Honor, but I do think it was fair to look to the later instruction for the definition of the term prior art as though that later instruction How could that be when the heading of that part is determining obviousness? There's a specific heading on page 10167 determining obviousness, and this prior art is only listed under that heading. It is not listed in the prior art together with anticipation. Well, I can see, Your Honor, that that's a way to look at it, but what we're talking about is the definition of the term prior art, and the fact that that definition is found under a different heading doesn't, to me, mean that it can't be considered by the jury with respect to the prior heading. I think that's, frankly, an overly strict or literal reading of the instruction to say that because it appears under the heading of obviousness, we can't use that definition for purposes of anticipation. We have to rely on counsel to be completely forthright with us, and I think there's a bit of a problem here. I don't want to take up your time. I'm sorry, Your Honor, I didn't mean to mislead anything. I felt that was a proper thing to point out, that it was included in the definition of the prior art. On the question of recapture, what is the evidence here that Kim sought to use in her case that surrendered this range and included the limitations that appeared in the continuation in part as a mechanism for overcoming the earlier obviousness rejection? When Dr. Kim filed her second application, which is a continuation in part application, her claims had been rejected based on the Tanaka patent, which included the very same acid combination, although not the same proportions that she was claiming. In this application, she set forth two acid concentration ranges, a broader range and a narrower range within that broader range. At the same time that she did that, she put forward a limitation calling for phosphate in every claim. Simultaneously, she broadened her claim to her acid range. I say she changed that acid range. Okay, but I understand what happened, but what's the evidence that she did that in order to avoid the obviousness rejection? Well, she labeled a portion of her remarks as an effort to distinguish the prior art, to argue patentability over the prior art, and within that heading, she argued about the concentration range, the amount of that acid. So she was clearly relying on that limitation to distinguish the Tanaka patent. Where did she distinguish Tanaka based on the new range and the addition of the phosphate limitation in the continuation in part? The circumstances were that the claims had been rejected based on Tanaka, and she then argued to distinguish the prior art that she had added the phosphate limitation, and then she went on and argued the range. Where does she, what I'm asking you is specifically where did she argue that as a basis for overcoming the prior art? In the remarks accompanying the continuation. Well, can you show me where? I have to find that record site, Your Honor, if you happen to do that. You have it there, because I don't, I was not able to find any such statement, and maybe I'm missing something. I don't want to miss something. I'd be happy to, I can find it in my brief, Your Honor, if you'd like to take the time to do that. Well, if you, I don't want to take a lot of time, but if you can point me to it. Well, it's approximately A2775. I can't, without a little more time, I can't find the exact site. You said A2775, Mr. Sherman? Mr. Schroeder, thank you. Mr. Pelletier? Yes, Your Honor, thank you. We have, you have your full three minutes left, but Mr. Schroeder, because he was responding to questions from the panel, had more time. He had about, I think it was, I think it was about almost 20 minutes. So we'll give you, we'll give you a total, you have three minutes now. So, Ms. Braun, if you could give Mr. Pelletier seven minutes total. Thank you. If you need any additional time, we'll give it to you to equal it out, but that, hopefully that will be enough. Let me ask you, right at the outset, one question that I discussed with Mr. Schroeder. Obviously, if we agree with the district court's claim construction, you lose on the infringement issue. I disagree with that. You disagree? I disagree, Judge. You say that even if we agree with the district court's claim construction? That's correct. I disagree. We will still win on infringement. Your theory is that Kim provided sufficient testimony to prove infringement under the district court's claim construction? No. My theory is that there is sufficient evidence in the record in total, including admissions, stipulated facts, Dr. Hosny's testimony, and tests. Okay. All right. Fair enough. Now, let me, I misunderstood then. Let me ask you this. If, however, we agree with your position and adopt your claim construction or one of the claim constructions that was being discussed, that you heard discussed with you and Mr. Schroeder, where does that lead us? Mr. Schroeder says, well, he would win anyway and we could rule in his favor. I'm sure you're not going to agree with that, but what would you say should happen next in the case if we agree with either your proposed claim construction or we adopt one of the ones that you've heard discussed? Separate from the district court's? Yes. In other words, we reject the district court's claim construction, but we're faced with either your claim construction or one of the ones you've heard us talk about, an accident or a slow-acting accident, and we have the stipulations. Where does that leave us? That leaves us with a finding of infringement because the phrase, as an accident, is already a limitation. The slow-acting nature of Dr. Kim's invention is set forth expressly and certain of the dependent claims, so that those are not at issue here. Just focusing on the independent claims, if you do read the limitation slow-acting into the independent claim, into the independent claim, you'll see that there's no substantial evidence, sufficient evidence to show infringement. That evidence specifically is, there's no disagreement, that chelation takes place. Dr. Hosny agreed. Dr. Kim agreed. Chelation being? Chelation being? Chelation. Chelation is when the food acid molecule comes into contact with the metal ion and binds it and holds it, and the food acid keeps the metal ion busy so the metal ion will not catalyze the conversion of ascorbic acid to dehydroascorbic acid. Dr. Hosny said, and I quote, it is likely that food acid would slow oxidation of ascorbic acid as Kim contends. Well, I, you're making some what may be very effective arguments, Mr. Pelletier, but really, given that we're an appellate court, isn't, if we disagree with the district court's claim construction and go your way or one of the ways we've been talking about, isn't the most appropriate way for the district court to assess the matter under the revised claim construction? I mean, that is most commonly what we do. Not always, I'll acknowledge, but most usually that's what we do when we revise a claim construction. Giving deference to the notion that infringement is a question of fact and is a jury question, I can understand and appreciate why with a revised claim construction that ultimate determination could be made or should be made by the district court. I think there is ample evidence in the record to resolve it, even based upon the claim constructions that I have heard discussed today. However, it certainly would be a possibility, depending upon how you resolve this issue, to send it back for a disposition, a reconsideration of the evidence, I suppose, a rebriefing of post-trial motions, perhaps, in light of that claim construction or perhaps a new trial. I don't think that's necessary because I think the record is fully developed on most of these points that I've heard discussed today. Were the stipulations that we were looking at, were those stipulations entered into on the basis of the district court's claim construction or were they prior to the construction? Well, that was after the district court's claim construction. Those stipulations were right before trial September 29th, I believe, 2004. That's what I was citing in the record. Yes. Okay. And, of course, the jury at that point obviously wasn't instructed and the trial hadn't taken place, but it did come after the claim construction ruling. Okay. Yes. What about the recapture question? Yes. It strikes me that, looking at this record, that we really don't know why the amendments reflected in the continuation in part, that is, the range question and the addition of the phosphate limitation, why they were put in. And it isn't clear that they were directed to the earlier obviousness rejection. Suppose we were to conclude that. A lot of our recapture cases have suggested that this is like prosecution history estoppel. And in prosecution history estoppel, of course, under Hilton Davis and Festo, there's the presumption that an unexplained amendment is designed to deal with patentability concerns. Why shouldn't we make that same recapture context and assume that if there's an unexplained amendment, that it's related to patentability? First of all, I would say the doctrine of equivalence certainly is what would be called into play with prosecution history estoppel. That's one distinction. But in this case, Judge, what we have here is the reissue statute. We're not dealing with case law. We're dealing with a statute, section 251. Well, I understand that, but our cases have suggested that the recapture doctrine is similar to prosecution history estoppel. And in prosecution history estoppel, an unexplained amendment is assumed to be related to patentability. Why not make the same assumption in the recapture context? Because in this case, the defendant has the burden of clear and convincing evidence to show that there was a deliberate surrender of subject matter scope. No such showing has been made here. The objective evidence, the burden of proof here is on the defendant to come forward and show that this patent is invalid for impermissibly recapturing. So your answer is because of different burdens of proof in the two contexts? Different burdens of proof. The different, the estoppel argument applies with respect to the doctrine of equivalence, which is an equitable doctrine. Section 251 is to be construed liberally and fairly so that a patentee, such as Dr. Kim, can come back within two years and broaden her invention so long as there was not a deliberate surrender. As to the phosphate limitation, the evidence is clear that the Patent Office stated that phosphate is not a patentably distinct limitation, and it couldn't have been because Tanaka disclosed phosphate. So by adding phosphate, Dr. Kim was not, could not be getting around Tanaka. I understand that argument. What about the range? The range of food acid was simply an oversight, a mistake by Dr. Kim. When she claimed her food acid range, she originally claimed her lower end, I think, was .03 in the original 129 patent issued. And when she finally saw it, three weeks later, she came right back into the Patent Office, practically immediately, and said, I didn't claim all I was entitled to. And the Patent Office never gave the food acid range a second thought. Originally the Patent Office said, recapture rule violation because you're taking the phosphate limitation out. But then the Patent Office was convinced there's no violation of the recapture rule here, and the District Court was convinced, because the objective evidence establishes that there has been no deliberate surrender of any recapture, of any subject matter. Did the Patent Office consider whether the addition of the range was, as part of the continuation in part, was designed to limit the patent, to overcome priority? Did the Patent Office consider that question? No. The Patent Office never rejected or objected any of Dr. Kim's claims because of the range of the food acid, and Dr. Kim never distinguished prior art. I'm sorry. I'm talking about in the reissue proceeding. In the reissue proceeding. Yeah. The Patent Office never was not concerned with the expansion of the ranges. Dr. Kim expanded the food acid range, the ascorbic acid range. I want to make sure I'm accurate on this point. She expanded the food acid range, she expanded the ascorbic acid range, and she expanded her phosphate range as well in the reissue. And the Patent Office properly recognized that she had never, ever relied upon any of those ranges to distinguish prior art. It was a mistake that three weeks after she realized that . . . Did they say explicitly that she hadn't relied on the ranges to distinguish prior art? I don't believe they stated it, but the record bears that out because she never had to overcome any prior art with any ranges that were impinging upon hers. Mr. Pelletier, you've gone over the additional time, but I think actually it adds up to about the same amount of time that Mr. Schroeder had. So I think we're about equal. Thank you. I appreciate the extra time. Thank you very much. Mr. Schroeder, thank you again. The case is submitted.